[No. B227341. Second Dist., Div. One. Aug. 31, 2011.]

In re ROBERT EDWARD FORCHION, JR., for Change of Name.

**Counsel**

Offices of J. Curtis Edmondson and J. Curtis Edmondson for Petitioner and Appellant Robert Edward Forchion, Jr.

**Opinion**

**MALLANO, P. J.**—This appeal presents the question of whether an individual may statutorily change his name to the name of his Web site, including the ".com." (See Code Civ. Proc., §§ 1275–1279.6.) The answer is no.

Petitioner, Robert Edward Forchion, Jr. (Forchion), is a resident of New Jersey. Since 2009, he has managed a Rastafarian temple in Los Angeles and has operated a medical marijuana dispensary that he claims is lawful under the Compassionate Use Act of 1996 (Health & Saf. Code, § 11362.5). He has devoted his adult life to promoting the legalization of marijuana and, in 2000, was convicted in New Jersey of marijuana offenses. Forchion is currently facing trial in New Jersey on marijuana charges arising out of an arrest on April 1, 2010. He is free on bail.

Forchion has a national reputation as a marijuana advocate and is popularly known as NJweedman. He operates a Web site, "NJweedman.com," which discusses his efforts to legalize the drug. In 2001, Forchion unsuccessfully petitioned the New Jersey state courts to change his name to "NJWeedman.com."

In April 2010, Forchion petitioned the court below to change his name to "NJweedman.com." The trial court denied the petition. Forchion appealed.

We affirm. A statutory name change to NJweedman.com would last indefinitely. But Forchion might lose the use of his Web site by failing to make periodic registration payments or by breaching the registration agreement. In that event, the *Web site name* (NJweedman.com) could be registered to someone else and, at the same time, Forchion could keep his new *personal* name (NJweedman.com). If both parties used that name to conduct business, confusion might result. Further, even if Forchion were allowed to adopt NJweedman.com as his personal name, *and* he properly maintained it as the name of his Web site, the name might be so similar to another Web site name or trademark that the multiple usage would create confusion.

■ Alternatively, the name change would associate Forchion's new personal name with the Web site's advice that individuals violate the law in several respects. A name change should not have that consequence.

And, given Forchion's strong ties to New Jersey and his failed attempt in 2001 to obtain the same name change there, we conclude that, as a matter of comity, California should not grant Forchion the relief his home state has already considered and denied.

# I

## BACKGROUND

The allegations and facts in this appeal are taken from the name change petition and the content of NJweedman.com (the Web site or the site). In that regard, we notified Forchion of our intention to take judicial notice of the content of his Web site and any other Web site to which it provides a link. (See Evid. Code, § 452, subd. (h).) He did not object, but expressed certain concerns, which we have taken into account. (See *id.*, §§ 455, 459.)[1]

A. *Biographical Information*

"Robert Edward Forchion (born July 23, 1964) . . . is a cannabis activist and a perennial candidate for various New Jersey elected offices. Forchion identifies himself as a member of the Legalize Marijuana Party and campaigns primarily on the single issue of cannabis legalization. Forchion has

---

[1] Because of the nature of this case, we frequently cite different pages of the Web site. For ease of reading, all citations that include or consist of a Web site address have been placed in footnotes. The footnotes contain only Web site information, not factual or legal discussion.

done various stunts to bring attention to cannabis legalization, including smoking cannabis in front of the Liberty Bell in Philadelphia . . . .

"Forchion is a resident of Browns Mills, New Jersey, a section of Pemberton Township, New Jersey. [¶] . . . [¶]

"At the age of 15, Forchion smoked his first marijuana cigarette and was 'immediately impressed by its medical healing powers, in regard to his asthma.' By age 18 he was a regular user of marijuana, and he dismissed the Surgeon General's claims of its harms as 'propaganda and Christian superstitions'.

"In 1982 upon graduation from Edgewood Regional High School in Atco, New Jersey, he enlisted in the New Jersey National Guard and enrolled at Claflin College, Orangeburg, South Carolina. In 1986 he received an honorable discharge from the [New Jersey] National Guard and enlisted in the United States Marine Corps . . . [;] he had an asthma attack and was medically discharged. After being discharged from the Marine Corps, he changed his name to Edward and enlisted in the United States Army. While in the army he used cannabis despite the warnings from the government, to control his asthma. . . . [I]n 1990 he receive[d] an honorable discharge from the army. He became a coast-to-coast trucker using his own truck he purchased in 1994.

"In 1995 Forchion became a practicing Rastafarian.

"He proudly admits he was a 'marijuana smuggler', driving hundreds of pounds of cannabis from Arizona border towns to east coast cities such as Cleveland, Ohio, Philadelphia, New York City and Camden, New Jersey. His Mexican/Cuban suppliers in Arizona were the first to dub him The New Jersey Weedman, because while other drugs were available for transport he only wanted to transport cannabis.

"On November 24, 1997 he was arrested by the Camden County Drug Task Force and members of the local [drug enforcement agency]—On December 1, 2000 after a very public trial, Forchion accepted a plea deal and was convicted and sentenced to 10 years . . . . He was released after 17 months on April 3, 2002 into the state's ISP . . . (Intensive Supervision Program). . . . [¶] . . . [¶]

"Forchion constantly had run-ins with New Jersey state authorities for what he described as exercising his free speech and what authorities described as advocating criminal activity.

"In 2008 Forchion fled to California seeking asylum, leaving the garden state for the pot friendly environs of Los Angeles. Forchion claimed he was living in political exile, having fled the official persecution of [New Jersey] State authorities for his political views on marijuana legalization.

"In 2009 he opened a Rastafarian Temple on Hollywood Blvd., named the Liberty Bell Temple II, after a series of protest[s] he held at the Liberty [B]ell in Philadelphia. At the Liberty Bell Temple he provided marijuana to hundreds of sick people every week, doing what he preached about in New Jersey. Being in Hollywood he quickly became a '[H]ollywood [persona]', providing marijuana to patients and celebrities alike. [Forchion] opened a party promotions company called NJweedmanPromotions. He stopped calling himself a 'marijuana activist' and instead insist[ed] he was now a 'marijuana capitalist'. He started hosting huge marijuana mansion parties in the Hollywood Hills where he openly provided marijuana to all the guests.

"He appeared in several documentaries, TV shows and music videos.

"In 2010 Forchion became [an] author, of his own biography titled[, Public Enemy #420,] NJweedman Super-hero[] of the Potheads[,] . . . first published on Jan[.] 18th, 2010[,] ironically the same day New Jersey legalized marijuana for medical purposes making Forchion feel vindicated for his decade of activism."[2]

At his Web site, an entire page is devoted to selling the book.[3] In addition, a small ad prefaced with, "Buy the book," appears on several pages of the site.[4] A viewer can purchase the book through an online process, which begins with a "click" on the ad.

"In 1998 as a way of supporting his planned jury nullification defense to the charges he was facing[,] he announced the formation of the Legalize Marijuana Party and his intention to run for a seat on the Camden County Freeholders board and the first district congressional seat. He now claims this was a successful tactic and has since continued to run for offices as a protest to the cannabis laws. Forchion . . . has a history of running for various state and federal offices as an independent candidate. Forchion has never been successful in any of his attempts for public office, which he acknowledges

---

[2] NJweedman, About "NJweedman" <http://home.njweedman.com/node/2> (as of Aug. 31, 2011) (some capitalization omitted). All Web site information was verified on August 31, 2011. For brevity, we have not repeated that date in subsequent citations.

[3] See <http://home.njweedman.com/node/9>.

[4] See, e.g., <http://home.njweedman.com/taxonomy/term/1>; <http://home.njweedman.com>; <http://home.njweedman.com/node/144>.

isn't even his goal."[5] In 2005, he ran for Governor of New Jersey; in 2006, he ran for the United States Senate from New Jersey; and, in 2008, he announced he would run for a congressional seat but did not obtain enough signatures to qualify.[6]

As reported in an interview during the 1998 campaign: " 'My daughters learn in school that marijuana is a dangerous drug,' [said] Forchion, who doesn't smoke tobacco, drink or do other drugs. 'But they've seen me smoke marijuana all their lives and they know it's not true. What happens when the school tells them heroin is a dangerous drug? Do they figure that's not true, either?' "[7]

"Forchion has a history that spans decades in his quest for his right to smoke marijuana legally. A cult figure in the marijuana legalization community, he achieved media notoriety when he was arrested for smoking marijuana in front of the entire New Jersey State Assembly in 2000, and garnered a national platform when he fired it up at [the] Liberty Bell in Philadelphia, PA during the [2000] Republican National Convention."[8]

"[As of June 9, 2011,] Forchion . . . is throwing his hat into the political ring again.

"The longtime marijuana activist has filed to run as an independent candidate [in New Jersey] for one of the 8th Legislative District's two state Assembly seats. He is one of 11 independents who have filed to run for state, county or local offices in the November [2012] general election. [¶] . . . [¶]

"Although Forchion submitted a petition with the required 100-plus signatures, his spot on the general election ballot is no sure thing given questions about his residency.

"Forchion acknowledges that he has lived and worked in California since 2008. He runs the Liberty Bell Temple on Hollywood Boulevard in Los Angeles, a state-registered medical marijuana clinic where he legally sells pot and claims to run the only Rastafarian ministry in the city.

"In a statement accompanying his nomination petition, Forchion said that he considers himself a political exile because of his outspoken beliefs about

---

[5] NJweedman, About "NJweedman" <http://home.njweedman.com/node/2> (some capitalization omitted).

[6] Ibid.

[7] Laymon, *A Candidate Inhales*, Philadelphia Daily News (July 2, 1998) <http://www.njweedman.com/candidate_inhales.htm> (italics omitted).

[8] NJweedman, Press Releases, June 2010—NJWeedman runs for Congress <http://home.njweedman.com/node/53>.

marijuana, but that he frequently returns to New Jersey to visit family and friends and continues to consider Pemberton Township his legal residence.

" 'Never have I renounced my citizenship to the state of New Jersey,' he said. 'I am NJWeedman, not the California Weedman or the Los Angeles Weedman—the New Jersey Weedman.' "[9] In an "affidavit" accompanying his nomination petition, Forchion stated: "I have always declared my official resident state as New Jersey. [¶] . . . I have always declared my existence in California as exile or 'political asylum'."[10] He explained that his "extended stays in California" are necessary for three reasons: (1) "My occupation is illegal in New Jersey, while legal in California. (Marijuana Provider)"; (2) "I own and operate a business that is illegal in New Jersey. (Medical Marijuana Dispensary)"; and (3) "I am a medical marijuana patient, my medicine and use of my medicine is still treated as illegal in [New Jersey] forcing me to spend more time in California . . . ."[11] Forchion's affidavit indicates that his residence is located in Browns Mills, New Jersey, and provides a street address.[12]

## B. *Liberty Bell Temple*

"[T]he [L]iberty Bell Temple[, incorporated on May 11, 2009,] is a peaceful [nonprofit] religious organization located in Hollywood, [California] . . . that provides 'medical/spiritual marijuana' for the cannabis consuming community of Los Angeles."[13]

"The Liberty Bell Temple comes in memoriam of a series of freedom protest[s] conducted in Philadelphia at the Liberty Bell by Edward Forchion and Patrick Duff. The protest was a deliberate attempt by these two to present the religious use of marijuana as a defense to federal marijuana charges. Beginning in [December] 2003 . . . [through] July 2004 once a month on the 3rd Saturday . . . these two freedom fighters in [an] act of civil disobedience held religious pray[er] services at Independence Hall in front of the Liberty Bell in which they concluded by ingesting marijuana at [4:20 p.m.]"[14]

"The mission statement of the Liberty Bell Temple is to provide the sacrament of our faith '[Marijuana]' to those in need of this Holy Medicine.

---

[9] NJweedman, News, Marijuana activist leads a field of 11 independent candidates <http://home.njweedman.com/node/135>.

[10] *Ibid.* (Capitalization omitted.)

[11] *Ibid.*

[12] *Ibid.*

[13] Liberty Bell Temple II, Home page <http://www.libertybelltemple.com/Home.htm> (some capitalization omitted).

[14] Liberty Bell Temple II, History of LBT <http://www.libertybelltemple.com/historyLBT.htm> (some capitalization omitted).

"While we personally believe any individual in need of this natural medicine should be able to use it[,] the Christian [lawmakers] of America have made it illegal. Here in California 'we the people' have made this God grown herb legal for medical use. Thus we have made a strict effort to comply with California State Law (Prop 215/SB420) and provide the 'herb' to those in need. Regardless of [an] individual[']s faith if [he or she] seek[s] our 'sacrament' and ha[s] the proper California ID [and] a California state doctor[']s recommendation in [compliance] with [Health and Safety] code [section] 11362.5 we will provide it as a duty of our faith. We regard this as one of our ministerly duties to provide [the] sacrament to those in need and want of it. . . ."[15] The Web site describes the religious use of marijuana dating back to ancient times.[16]

A video features Forchion giving a walking tour of the temple while explaining how to enter the premises and purchase marijuana. During the tour, he points to a "menu board" that lists the various strains of marijuana for sale, commenting that the temple has around 25 different strains, which frequently change. The temple also offers marijuana products in nonsmoking forms, such as popcorn, brownies, and butter. The walking tour ends with a view of the temple's smoking lounge.[17]

A "medicine menu" shows the available strains of marijuana and their prices.[18] Discounts are available for certain illnesses, and new customers get a bonus with their first purchase.[19]

On July 14, 2010, the Liberty Bell Temple was raided by the Los Angeles Police Department (LAPD). " '[T]he LAPD confiscated three pounds of medical marijuana, almost $7,000 of supplies and all the cash on the premises. [The] Temple staff was handcuffed and [Forchion and his] partner . . . were arrested and jailed.' "[20] In response, the temple filed a civil rights lawsuit against the city (*Liberty Bell Temple II v. City of Los Angeles* (Super. Ct. L.A. County, No. BC442491)).[21] The temple unsuccessfully

---

[15] Liberty Bell Temple II, Mission Statement <http://www.libertybelltemple.com/Mission Statement.htm> (some capitalization omitted).

[16] Liberty Bell Temple II, Religious Use of Ganja <http://www.libertybelltemple.com/ReluseGan.htm>.

[17] The video of the tour may be accessed through the "Virtual Tour" link on the left side of the temple home page (Liberty Bell Temple II, Home page <http://libertybelltemple.com/Home.htm>) or directly at <http://www.vimeo.com/3871422>.

[18] Liberty Bell Temple II, Medicine Menu <http://www.libertybelltemple.com/Menu.htm>.

[19] Liberty Bell Temple II, Menu <http://www.libertybelltemple.com/Coupons.htm>.

[20] NJweedman, Press Releases, July 2010—NJweedman's Liberty Bell Temple Raided by LAPD <http://home.njweedman.com/node/56>.

[21] The complaint may be found at <http://www.libertybelltemple.com/lawsuit/Complaint_for_Liberty_Bell_Temple_II.pdf>.

sought a temporary restraining order to prevent the city from conducting another raid. It did not seek a preliminary injunction.[22] But the temple intends to go forward with the litigation.[23] After the raid, the temple reopened and has continued to operate without incident.

On August 11, 2010, the city issued a press release discussing the temple's lawsuit, saying: "Operators of the Liberty Bell Temple dispensary initially sought a temporary restraining order against the City seeking to stay any enforcement against [its] location on religious grounds, which the court denied on July 29, 2010. Liberty Bell did, however, have the option to pursue a preliminary injunction against the City which it no longer intends to do, according to correspondence with the City Attorney's Office.

"On July 14, 2010 officers with the Los Angeles Police Department obtained a court-ordered search warrant for the Liberty Bell Temple dispensary, located [on] Hollywood Boulevard, after officers made undercover buys of marijuana from the facility in violation of state and local law. Declarations by Los Angeles Police Officers confirmed that the sales of marijuana occurred without any religious activity or pretense. Officers were able to recover several hundred grams of marijuana from the facility as well as currency, an ATM machine, scales, a cash register and other items indicating narcotics sales."[24]

Finally, the temple's "creed" is accessible on its home page by using the link on the left side of the page marked "CREED" in red letters.[25] Members are required to sign the creed, obligating them to follow the "[tenets] of Rastafari" and "ingest[] . . . ganja [(marijuana)] to properly practice this religion."[26] At the bottom of the creed, the member indicates whether he or she is "a medical marijuana patient [with] a doctor[']s recommendation" *or* "a spiritual user of [marijuana who] do[es] not have a doctor[']s recommendation."[27] Thus, the creed contemplates that some members of the temple, although required to ingest marijuana, will *not* be qualified patients under the Compassionate Use Act of 1996.[28] Similarly, in the temple's lawsuit against the city, the complaint alleges "Liberty Bell Temple II operate[s] as a

---

[22] See NJweedman, Press Releases, August 2010—NJweedman's Liberty Bell Temple files One Million Dollar Lawsuit against City of Los Angeles <http://home.njweedman.com/node/57>.

[23] *Ibid.*

[24] Press release, Office of the Los Angeles City Attorney (Aug. 11, 2010) <http://atty.lacity.org/stellent/groups/electedofficials/@atty_contributor/documents/contributor_web_content/lacityp_011266.pdf>.

[25] Liberty Bell Temple II, Home page <http://www.libertybelltemple.com/Home.htm>. The creed may be found directly at <http://www.libertybelltemple.com/CREED.pdf>.

[26] <http://www.libertybelltemple.com/CREED.pdf> (some capitalization omitted).

[27] *Ibid.* (some capitalization omitted).

[28] *Ibid.*

Rastafarian Temple where marijuana [is] provided and used as a sacrament. . . . Liberty Bell's provision of marijuana [is] not for medical but instead religious purposes."[29] Forchion contends "Courts have long held . . . that Rastafarians are immune from laws criminalizing the use of marijuana; so long as those Rastafarians are in possession of marijuana to use in conjunction with their religious beliefs."[30]

## C. Pending Criminal Charges in New Jersey

Meanwhile, on April 1, 2010, Forchion drove from California to New Jersey, in part to visit relatives. After seeing his children in Burlington County, New Jersey, he was on his way to Camden County to stay with other relatives when he was stopped by a New Jersey state trooper for a traffic violation. During the stop, the officer learned that Forchion had two outstanding warrants, smelled burnt marijuana, and saw a glass smoking pipe on the rear floor. Eventually, a search of the car led to the discovery of a pound of marijuana in a suitcase in the trunk. Forchion was arrested, charged with drug possession and possession with intent to distribute, and was released on bail.[31]

At the time of Forchion's arrest, New Jersey had adopted the New Jersey Compassionate Use Medical Marijuana Act (N.J. Stat. Ann. §§ 24:6I-1 to 6I-16), but the act had not yet been implemented. By the end of this year (2011), the six authorized dispensaries may be operating for the first time.[32]

On August 31, 2010, "[a] Burlington County grand jury indicted [Forchion] . . . on charges of third-degree possession with the intent to distribute and fourth-degree possession . . . . [¶] [A] Burlington County Assistant Prosecutor . . . said in court that the state's plea offer, based on Forchion's charges and criminal history, is six years in state prison, including three with no

---

[29] *Liberty Bell Temple II v. City of Los Angeles, supra*, No. BC442491, complaint, page 3, paragraph 13 <http://www.libertybelltemple.com/lawsuit/Complaint_for_Liberty_Bell_Temple_II.pdf>.

[30] *Id.* at page 2, paragraph 3; see *id.* at page 6, paragraph 27, citing Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb et seq.) and California due process clause (Cal. Const., art. I, § 7, subd. (a)).

[31] See NJweedman, News, "NJ Weedman" has high hopes after pot bust <http://home.njweedman.com/node/105>; NJweedman, Press Releases, April 2010— NJWeedman arrested on April Fools Day <http://home.njweedman.com/node/52>.

[32] See *Sensible and Humane*, N.Y. Times (July 27, 2011) <http://www.nytimes.com/2011/07/28/opinion/28thu3.html>; Wolski, *Update on Medicinal Marijuana Program*, Coalition for Medical Marijuana—New Jersey (Apr. 8, 2011) <http://www.cmmnj.org>.

parole eligibility."[33] Trial was set for June 21, 2011, but has been postponed while the trial judge considers Forchion's constitutional and statutory attack on New Jersey's marijuana possession laws.[34] Forchion argues the laws violate due process, equal protection, the free exercise clause of the First Amendment, and the Religious Freedom Restoration Act of 1993 (42 U.S.C. §§ 2000bb to 2000bb-4).[35]

If Forchion's pretrial challenge is not successful, he will represent himself at trial and rely on the doctrine of jury nullification as a defense.[36] He will attempt to convince the jury that New Jersey's marijuana laws are unjust, and he should therefore be acquitted regardless of the evidence.[37]

In the video section of the Web site, one video is captioned "Message to My Jurors."[38] Above the video screen, the following appears in print: "On April 1st, 2010 while visiting my family in New Jersey I was arrested. I now have a criminal case in New Jersey—please follow this case at http:www.njweedman.com/challenge.html—Hopefully a member of my future [j]ury will see this and just say NOT GUILTY."[39] At the beginning of the video, the following words appear: "TO MY JURY. Fuck the State! I'm the defendant[.] I[']m the victim of . . . the lies of the state of NJ and the Do-Gooder politicians that claim marijuana is dangerous and addictive. The state lies, marijuana is one of the safest substances on the face of the planet." After that introduction, Forchion appears, sitting in a vehicle. He complains that *he* is the victim in the criminal case because he got "snatched" from his car, spent four days in jail, lost a pound of marijuana, had to pay $13,000 to make bail, and is facing time in prison if he is convicted. Eventually,

---

[33] NJweedman, News, NJweedman Pleads Not Guilty <http://home.njweedman.com/node/107>.

[34] See NJweedman, News, *Judge rules traffic stop on NJWeedman was legal* <http://home.njweedman.com/node/82>; NJweedman, News, *Prosecution Procrastination Delays NJweedman Trial* <http://home.njweedman.com/node/141>.

[35] Brief and Appendix in Support of Pretrial Motions on Behalf of Defendant Edward R. Forchion <http://www.njweedman.com/challenge_brief.htm>; see also Camilli, *NJWeedman seeks to have drug charges dropped*, Burlington County Times (July 25, 2011) <http://home.njweedman.com/node/142>.

[36] See NJweedman, News, *NJWeedman can represent himself in court* <http://home.njweedman.com/node/137>; NJweedman, Press Releases, *April 2010—NJWeedman arrested on April Fools Day* <http://home.njweedman.com/node/52>.

[37] NJweedman, Press Releases, 4/20/2010 Press Release <http://home.njweedman.com/node/17>.

[38] NJweedman, Videos, Message to My Jurors <http://home.njweedman.com/taxonomy/term/8?page=1>.

[39] *Ibid.*

Forchion stops talking, and the screen goes dark. Then, these words appear: "USE JURY NULLIFICATION—JUST SAY NOT GUILTY."[40] The video is also posted on YouTube.[41]

On another Web page, the same video can be seen, though smaller in size.[42] A few inches below the video screen are the following words: "Personal message to my future juror[s], keep quiet don[']t tell anyone [you're] going to [flat out] acquit no matter what the prosecution presents— Just say 'NOT GUILTY[.]' [U]tilize Jury Nullification to end this ridiculous war on potheads." At the bottom of the same Web page is a link identified by "CLICK HERE TO LEARN ABOUT JURY NULLIFICATION." If a viewer "clicks" on a nearby blue box, bearing the name "Fully Informed Jury Association," a new Web page appears, setting forth a lengthy discussion in favor of jury nullification, with commentary and examples from numerous sources.[43] The new page also provides a link to the official site of the Fully Informed Jury Association, which offers a "Juror's Guide" and other material supporting jury nullification.[44]

D. *"Grow Your Own"*

In a video lasting approximately five and one-half minutes, Forchion explains how an individual can set up an automated system to grow his or her own marijuana at home.[45] He discusses air intake and exhaust, use of heat lights, construction of a hydroponic watering system, use of timers, and control of room temperature. Forchion estimates that the system shown in the video would cost between $2,000 and $2,500 "after a couple of Home Depot runs." He tells viewers they may contact him for assistance in setting up a "grow room." In exchange, he would want "a couple of bucks" and a "split of the proceeds." At the end of the video, Forchion is off screen, and written information scrolls by, including Forchion's e-mail address and finally: "GROW YOUR OWN," "FUCK THE LAW!!!"

E. *"Don't Worry About Your Job"*

At the bottom of the home page for Liberty Bell Temple, Forchion writes: "Don't worry about your job, learn about the THC test and how to pass a

---

[40] *Ibid.*

[41] <http://www.youtube.com/watch?v=tqGTBH8papA&feature=player_embedded>.

[42] News <http://www.njweedman.com/inquirer4062010.htm>.

[43] Jury Nullification and the Rule of Law <http://www.friesian.com/nullif.htm>.

[44] See Fully Informed Jury Association, American Jury Institute <http://fija.org>.

[45] NJweedman, NJweedman's—Homedepot Grow <http://home.njweedman.com/node?page=5>; also found at <http://home.njweedman.com/node/69>.

drug test."[46] That sentence appears in red print with the exception of the words "THC test" and "pass a drug test," which appear in light green; each of those phrases, respectively, is a link to a different Web site where products are sold that will "detox" and "cleanse" a person's body of the recent use of alcohol, amphetamines, barbiturates, cocaine, marijuana, and methamphetamines, allowing an employee to pass a drug test.

## F. Attempted Name Change in New Jersey

On December 12, 2001, Forchion filed papers in the New Jersey Superior Court, Law Division, to change his name to "NJweedman.com." The law division denied his request. He appealed. On February 24, 2004, the New Jersey Superior Court, Appellate Division, reversed and remanded for further proceedings. The appellate court stated:

"The complaint [in this case] recited the statutory criteria that it was 'not being made with the intent to avoid creditors or criminal prosecution or for other fraudulent purposes.' The complaint also set forth that Forchion had been convicted of several crimes, '[c]onspiracy [with intent to distribute a controlled dangerous substance], [t]heft, [p]ossession.' . . . [W]hen the complaint was filed, it recited that Forchion was then incarcerated at Riverfront State Prison. The reason given for the name change request was: 'I wish to assume my professional name, and for personal reasons I wish to change [my] given name.'

"On January 7, 2002, the Camden County Prosecutor's office filed opposition. Based upon Forchion's criminal record, particularly marijuana distribution, and the fact that 'weed' is a common vernacular for marijuana, the State asserted that 'it is clear that petitioner wishes to change his name for business purposes, that business being the sale of marijuana.' The State's opposition continued: 'Clearly, such a name change is "an unworthy motive," is for a criminal purpose and is offensive to common decency and good taste. It is clearly against the public interest to allow petitioner to change his name to a professional name that promotes the sale of Marijuana. Allowing petitioner to change his name would open the floodgates to all drug dealers and other criminals to change their names to professional criminal type names. Moreover, petitioner's motive is clearly criminal in that its purpose is clearly to enhance his business of selling Marijuana. This is clearly an unworthy motive, a criminal purpose, and is offensive to the public.' The matter was set down for a hearing on February 15, 2002. On February 11, the assistant prosecutor wrote the judge confirming the date and that the matter would be decided 'on the papers.' The letter concluded by advising that counsel would

---

[46] Liberty Bell Temple II, Home page <http://www.libertybelltemple.com/Home.htm>.

be available if the court required an appearance. In fact, on February 15, the assistant prosecutor did appear before the court. We accept the assistant prosecutor's representation at argument that her appearance was requested by the judge. In any event, Forchion was not present since he was still in prison.

"After placing the contents of the complaint on record and hearing from the State, the judge read some or all of what was described as Forchion's 'very lengthy reply to the State's opposition.' The essence of the reply was the contention that his request was not for criminal purposes, as the State suggested, but to promote his advocacy for reform of the marijuana laws. He asserted that, 'I have absolutely no intention of committing a fraud and the State of New Jersey's contention that I'm motivated by a desire to enhance some criminal activity is unfounded and surely would not be proved.'

"In rejecting the request, the judge concluded that 'in his zeal to legalize marijuana . . . [he seeks] to glamorize, persuade others to use marijuana and to violate the law. . . .' The judge went on as follows:

" 'The name here certainly is somewhat bizarre. Most—well, I've never taken a poll, but the public policy of the State of New Jersey is that the substance that is glamorized by the name is illegal and prohibited to possess or use and the Court finds as a matter of law that that then becomes an unworthy motive.

" 'Mr. Forchion tells us that this is his professional name. This is for personal reasons. And then goes on to tell us, too, that he wants to write a book, that he has written a comic book, that he wants publicity about his advocacy of marijuana and his advocacy that many people use marijuana, and I just read, what his estimate of use is.

" 'So without repeating myself a third or fourth time, I find that the request meets the various negative criteria that I have referred to and the Court does exercise its discretion and finds that it is an inappropriate name. If Mr. Forchion wishes to continue to use it on an informal basis, that's his business.' "[47]

The appellate court went on to say: "On appeal, both sides address the merits of the name change. However, Forchion also challenges the manner in which the proceeding took place, with the court only hearing oral argument from one side. As he states in his brief before us, the nature of the hearing

---

[47] *In the Matter of the Application of Robert Edward Forchion, Jr. to Assume the Name of NJweedman.com* (N.J.Super.Ct.App.Div., Feb. 24, 2004, No. A-3658-01T3) (nonpub. opn.) <http:www.njweedman.com/NJ_name_change_appeal_final_witharticles.pdf> (some capitalization omitted).

denied him the right 'to present witnesses in his favor or to rebut bogus testimony of State.' That position was reasserted forcefully by Forchion at oral argument when he informed us that he would welcome the opportunity to convince the Law Division judge that his request is not based upon illegal motives.

"Given these circumstances, we conclude that it is appropriate to remand the matter to the Law Division for reconsideration with both sides present and able to argue their positions. Forchion may, if he wishes, proffer his own testimony and that of others in support of his application. In this way a full record can be made. The focus of the remand should be on whether the request is, as the State contends, part of a plan to illegally traffic in marijuana or persuade others to violate the laws as they presently exist or, as petitioner contends, to advocate for reform of the present laws."[48]

As directed, the New Jersey Superior Court, Law Division, conducted an evidentiary hearing. At the conclusion of the hearing, it again denied Forchion's request for a name change. Forchion appealed. On May 4, 2004, the New Jersey Superior Court, Appellate Division, rendered its second decision, explaining:

"At the remand hearing, the State presented three law enforcement officers to provide details concerning Forchion's two prior indictable convictions for drug and drug related offenses. The State's purpose was to demonstrate the breadth of [Forchion's] involvement in drug trafficking, beyond what might be gleaned solely from the judgments of conviction. Forchion was also called as a witness by the State and provided his explanation of the events leading to his two indictable convictions. We will not detail the State's evidence in that regard as we do not find it particularly helpful, and certainly not dispositive of the issue before us.

"Forchion produced two witnesses. The first, Patrick Duff, described himself as a 'consultant,' someone who 'help[ed] people buy cars' and a 'radio host.' He first met Forchion around 1998 and was introduced to him as, and has continued to know him as, 'the Weedman.' Significantly, Duff provided the following testimony under questioning by Forchion:

"Q. Okay. Since 1998 to now, have I ever sold marijuana to you?

"A. No.

"Q. But you know I do use marijuana, right?

---

[48] *Ibid.*

"A. Yes.

"Q. Okay. The State here is alleging that I am in an enterprise, criminal enterprise to distribute marijuana. Do you believe that?

"A. No. I believe you're distributing marijuana information which the State doesn't like because the information is true and valid and their information is not.

"Q. Okay. Do you believe there's a distinction between a person who sells marijuana and a person who advocates the reform of the marijuana laws?

"A. Well, I think that marijuana has to come from somewhere so to only prosecute the guy who has the large amount and not the guy with the—and not the guy with the one joint is a bit . . . ridiculous. I just think that all the marijuana laws are ridiculous, so I think the advocation of legalization of marijuana is, like Martin Luther King said, an act of civil disobedience. And, like you do, standing up to the Government in this way, is the highest respect for the law.

"Duff testified that Forchion was one of the 'largest' marijuana reform advocates in the country. Through his questioning of Duff, Forchion elicited that while he (Forchion) did not sell marijuana or obtain marijuana for others, he had 'no problems smoking it or smoking it with others.'

"Forchion's other witness was Scott Ducko, a 'hip-hop recording artist' affiliated with a group called the 'Herbalists' who also knew Forchion as 'Weedman' or 'NJ Weedman.'

"In the course of his closing argument, Forchion said:

" 'And, again, I freely admit that I was involved in criminal activity. I am no longer involved in criminal activity, other than the fact that I still smoke marijuana; other than the fact that I do go buy marijuana sometimes, so that's why I took offense to the officer who talked about, you know, people who buy marijuana are contributing to the system, because you know, that's how people are sucked into the system's conspiracy laws. You go to buy marijuana, the next thing you know you're part of this empire that sells marijuana. The next thing you know you're in jail because you were buying marijuana for yourself. [¶] . . . [¶]

" 'That's what I do, I constantly bash the Government's position on the drug laws, the drug policies. And, that's you know,—and I use my name to enhance that aspect of my activism. [¶] . . . [¶]

" 'And, I think that's what this decision should be based on, what I'm doing now, what I have been doing basically since I've been arrested, since I've been to—went to prison. There's no one, absolutely no one, at least since 2000 who can say I sold them anything. There is an individual in 2000 who says I sold him something and I got arrested for it. And, honestly—in all honesty, I haven't sold any marijuana—any significant amount of marijuana, should I say, since 1997. I think I did once or twice. You know, I'm buying a bag for myself and I think I did once or twice take the money for someone else and throw a little tax on it and give it to them, but as far as a business, as far as enhancing some criminal activity that the State alleges, no—not at least in four years.' Judge Fratto ruled, in pertinent part, as follows:

" 'Based on petitioner's prior convictions, it's clear certainly that he has dealt in the illegal handling and distribution of marijuana. I recognize that he now protests that those convictions were either obtained illegally or that he made a confession to the crimes in order to obtain the plea, but that he subsequently recanted on those confessions. In any event, he does stand convicted for the illegal handling and distribution of marijuana.

" '. . . [I]n his reply to the State's opposition to the change in name that was filed back originally when the State filed their opposition, he admits to helping citizens obtain marijuana in the past. He denies currently being involved in drug dealing for money.

" 'Is Mr. Forchion an advocate for the reform of the marijuana laws? I think there is absolutely no doubt that he is an advocate for reform. The videos show it, the comic books show it, his appearances on radio stations show that he is an advocate for reform. But I think he is more than that. On his website, which he invited me to view and which I did view previously, and in his statements, he still advocates the breaking of this law which he believes to be unfair and unjust. . . . [L]et me give you an example. On his website there is a portion where anybody can . . . [learn] how to grow marijuana. There is another section where apparently there was a—there is a Government agency that provides a reward for information about those who grow marijuana. And, his comment was, ["]NJWeedman . . . encourages citizens to call the State's snitch line and give your opinion of it. Call from pay phones. And, I personally wish that you give these assholes bogus information.["] Then there is a disclaimer. ["]This is not a direct call to commit a crime, if doing such is a crime. I'm only expressing my desires or my wishes.["] It sounds like a direct call to me. [¶] . . . [¶]

" 'As I say, he advocates the breaking of the law which he believes to be unfair and unjust. He concedes, as did Martin Luther King, Jr., whom he cites on his website, that one who breaks the law must do so with the willingness

to accept the penalty. It is his position, as it was Dr. King's, that he breaks the law and encourages others to break the law in order to have such laws changed. That's the nature of advocacy, civil disobedience. But until that law is changed, marijuana however remains a substance, the possession, the sale, the distribution of which is illegal. It is not this Court's function to determine whether the prohibition against marijuana is a good law or a bad law.

" 'I'm certainly aware of the many, many people that agree with Mr. Forchion that the prohibition on marijuana is a bad law. Most people span the spectrum of our citizenry up to and maybe beyond and including a lot of judges that may agree with him. It is not my function, however, to determine that. It is this Court's function and it is this Court's duty to accept the law as it exists, to enforce it as it exists and in the present context to exercise its discretion to withhold the name change if such change would be and could be used for illegal purposes. It is my opinion, and Mr. Forchion himself said, while protesting that he doesn't deal in drugs, that he could. And, it's my opinion that he could and would use the name NJWeedman.com to enhance his participation in the sale or distribution of marijuana and/or, excuse me, in promoting the violation of the law as it presently exists.

" 'This Court, through the exercise of [its] discretion, refuses to give its imprimatur to petitioner's change of name where doing so will be used by him to promote what is presently an illegal activity.'

" 'So the application to assume the name of NJWeedman.com is denied.' "[49]

The appellate division then stated: "As our cases have made clear, the decision of whether to permit a legal change of name under the statutory procedure set forth in N.J.S.A. 2A:52-1 to -4 entails an 'exercise of judicial discretion.' . . . Although the statute sets out information that must be provided in the complaint for change of name, . . . it provides no explicit standard for denial. Nevertheless, one of the recognized bases for denial of a change of name request is where the applicant is found to have an unlawful purpose. . . . Such was the basis upon which Judge Fratto denied the present application and we find no abuse of discretion in that determination.

"We do not enter the debate over whether the marijuana laws are good or bad. At the present time, marijuana possession, as well as its distribution, is against the law. It is clear that while he advocates for reform of the present

---

[49] *In the Matter of the Application of Robert Edward Forchion, Jr. to Assume the Name of NJweedman.com* (N.J.Super.Ct.App.Div., May 4, 2004, No. A-3658-01T3) (nonpub. opn.) <http:www.njweedman.com/NJ_name_change_appeal_final_witharticles.pdf> (citations omitted).

laws regulating marijuana, Forchion breaks those laws. He admits, at the very least, to smoking marijuana as well as to purchasing it for himself and on a few occasions for others as well. One cannot smoke marijuana without possessing it, and purchasing for another is a form of distribution. It is likewise clear that Forchion's advocacy encourages others to possess marijuana in order to use it, thereby also violating the law. . . . [B]y encouraging others, through his website quoted by the judge, to provide 'bogus information' to law enforcement authorities, Forchion advocates law breaking. See N.J.S.A. 2C:28-4b(2) (disorderly persons offense to furnish law enforcement authorities with information relating to an offense or incident knowing that the person has no information relating to the offense or incident).

"Based on these matters, as evaluated by the judge after hearing the witnesses and judging their credibility—including that of the applicant—the denial of the statutory authority to change names was properly grounded on Forchion's criminal activity and the connection of his proposed name with such activity. We affirm substantially for the reasons expressed by Judge Fratto in his oral opinion . . . ."[50]

## G. Present Name Change Petition

On April 27, 2010, Forchion filed a petition in the court below, seeking to change his name from Robert Edward Forchion, Jr., to "NJweedman.com." He stated that the reasons for the name change were "professional, personal, [and] religious." He complied with the publication requirement of the name change process, publishing notice of the proposed change in four weekly issues of the LA Weekly. No one objected to the petition.

By order dated July 27, 2010, the trial court denied the petition, explaining: "In this instance, Petitioner Robert Edward Forchion, Jr. seeks to have the court grant his Petition for Name Change which would include a '.com' ending ('NJweedman.com'). As Petitioner is no doubt aware, there are [Web site] names which use that same '.com' identifier. . . . It is the court's understanding that [Web site] names are not typically owned by the users. Users, although sometimes referred to as 'owners,' are actually mere registrants or holders of the [Web site] name. . . . Whether or not there is currently in use, or otherwise subject to any rights in a third party, a [Web site] name identical or substantially similar to [the personal name] proposed by Petitioner, Petitioner's proposed name change, in the form currently proposed, would likely create confusion and/or conflict regarding its use and/or possible or asserted ownership right. As such, the court DENIES the proposed name in its currently proposed form."

---

[50] *Ibid.*

Put another way, Forchion could not be allowed to change his name to NJweedman.com because he did not "own" the Web site; he was a mere "registrant" or "holder" of NJweedman.com and could possibly lose the right to use NJweedman.com as a Web site name. Further, if an individual were allowed to adopt a name ending in ".com," it might create confusion with other Web site names or trademarks.

Forchion appealed.

## II

## DISCUSSION

We review the trial court's order for an abuse of discretion. (See *In re Ritchie* (1984) 159 Cal.App.3d 1070, 1072–1073 [206 Cal.Rptr. 239].) " 'We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale.' " (*Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 433 [110 Cal.Rptr.3d 498]; accord, *County of Los Angeles v. Superior Court* (2009) 181 Cal.App.4th 218, 226 [104 Cal.Rptr.3d 230].)

Forchion argues he should be permitted to change his name to NJweedman.com because he "owns" that moniker as a Web site name. In response, we requested a supplemental letter brief addressing several issues, including "whether it is possible for the Web site NJweedman.com to become registered to or owned by some person or entity other than [Forchion] and, if so, the circumstances under which that could occur." Forchion submitted a four-page letter brief, plus 10 pages of exhibits.

We conclude that, regardless of the nature of Forchion's proprietary interest in the Web site, he could lose that interest by failing to pay periodic registration fees or by breaching the registration agreement. If the trial court had granted his petition, he would still be able to use his new personal name, NJweedman.com, and someone else might acquire the identical Web site name. If both parties then used NJweedman.com in commercial transactions—one as a personal name, the other as a Web site name—the dual use by different parties might cause confusion.

Even if Forchion properly maintained the Web site name, such that he could use NJweedman.com as his *personal* name and his *Web site* name, NJweedman.com might be so similar to another Web site name or a trademark that its multiple use would create confusion.

Alternatively, granting the name change would associate Forchion's new *personal* name with the Web site's advice that individuals violate the law in several respects. A name change should not be permitted when it would have that effect.

And, given Forchion's strong ties to New Jersey and his failed attempt in 2001 to obtain the same name change there, we conclude that, as a matter of comity, California should not grant Forchion the relief his home state has already considered and denied.

### A. *Common Law and Statutory Name Changes*

"The phrase 'common law change of name' refers to the adoption and use of a name different from the one by which a person was formerly known, without resort to judicial process or other intervention by the state. The usage reflects the fact that at common law, all persons had, and in most common law jurisdictions including California, continue to have a right to change their given names and surnames at will. In modern times the phrase generally denotes the right of a person to use whatever name he or she chooses, as long as the purpose is not 'to defraud or intentionally confuse.' . . .

"In California, as in most American jurisdictions . . . , a procedure has been established by statute (Code Civ. Proc., §§ 1275–1279.6) for the formal changing of one's name. The purpose of the statutory procedure is to have, wherever possible, an official record of the change. . . . But resort to the statutory procedure is not necessary either prior to commencing use of a new name, or afterward, for the purpose of rendering a prior name change valid. The statutory method for changing names does not repeal or displace the common law ability to change one's name. (Code Civ. Proc., § 1279.5, subd. (a).) Accordingly, a person may change his or her name without legal proceedings simply by adopting another name and using it as his or her own. . . .

"The statutory procedure's very placement of the new name on the public record, however, unquestionably affords some advantages not bestowed on a common law name change standing alone. The statutory process provides an official document by which the change of name is definitely and specifically established and easily proved even after the death of all contemporaneous witnesses. Conversely, the inability to establish one's name for purposes of life's daily transactions, although perhaps only occasionally resulting when sole reliance is placed on the common law method, can be a substantial inconvenience when it occurs. Such are the circumstances in which one may be led to question the 'validity' of a common law change of a name.

"A common law name change is 'valid' notwithstanding the failure or refusal of others to recognize and rely on the new name. The validity of the

name change is unaffected by the refusal of others to accept it, simply because the validity of the change does not include a requirement that it be recognized or accepted by the world at large, or . . . by anyone except the one who assumes it. . . . A common law name change, in other words, carries with it no mandate to those with whom one comes in contact to accept at face value the nexus between the new name and the individual who assumes it.

"Thus 'validity,' for purposes of a common law name change, means that one has the freedom to change one's name and to use whatever name he or she chooses, qualified only by the proviso that the purpose not be dishonest. To change one's name by the common law method is to exercise the freedom to unbind oneself from the given name or surname acquired through birth or prior assumption, and to identify oneself anew; it is not to unilaterally impose recognition or acceptance of the newly chosen name as an obligation incumbent upon others." (83 Ops.Cal.Atty.Gen. 136, 136–138 (2000), citations & fn. omitted.)

 "The common law recognizes the right of a person to change his name without the necessity of legal proceedings; the purpose of the statutory procedure is simply to have, wherever possible, the change recorded. . . . While California case law seems to favor the legal change of a name to conform to usage, and while these cases uniformly teach us that there must be a substantial reason for the denial, they nonetheless recognize that the statute does vest the trial court with discretion in granting or denying an application for a name change. ([Code Civ. Proc.,] § 1278 . . . .) While it has been said that the trial court may properly deny the application if the name was adopted to defraud, intentionally confuse or intrude into someone's privacy . . . , it is well settled that each case must be decided on its own facts, and that in adjudicating the issue additional reasons may also be considered." (*In re Ritchie, supra,* 159 Cal.App.3d at p. 1072, citations & fn. omitted.)

"[Code of Civil Procedure] [s]ection 1276 et seq. governs the process by which an individual can obtain a formal legal name change in California. The statute provides that, once a petition seeking a name change is filed, the superior court shall make an order setting forth the details of the petition and direct all persons interested in the matter 'to appear before the court at a time and place specified . . . .' . . . The order directs that notice of the hearing and pending petition be published in a newspaper of general circulation. Section 1278 provides that if an objection is filed by any person, the court may examine 'on oath' any persons 'touching the petition or application' and 'may' order the name change or dismiss the petition 'as to the court may seem right and proper.' ([Code Civ. Proc.,] § 1278, subd. (a).) If no objection is filed with the court, the court 'may, without hearing, enter the order that the change of name is granted.' ([*Id.,*] § 1278, subd. (a).) The word 'may' is

construed as granting the superior court discretion in deciding whether to grant the petition." (*In re Arnett* (2007) 148 Cal.App.4th 654, 657–658 [56 Cal.Rptr.3d 1], citation & fn. omitted.) "We do not mean to suggest that the lower court must in every case grant a petition in proper form for change of name, but it is our view that some substantial reason must exist for the denial . . . ." (*In re Ross* (1937) 8 Cal.2d 608, 610 [67 P.2d 94].)

"While the courts have a unique power to certify a name change, [Californians] still may refer to themselves by any name they like. . . . They may not [necessarily] demand that government agencies begin using their new names without a court order. This dual structure recognizes the reality that names serve multiple purposes, both private and public. . . . Among the private purposes are self-expression and identity, which are served by a person's ability to change one's name at will in social and informal settings. . . . Among the public purposes are identification and communication, which are served by the State's ability to tether one's name to a fixed identifier. . . . [¶] The modern tendency toward use of government-issued identification in both private and public settings may shrink the field governed by the common law, but both common law and statutory processes have long coexisted with respect to names, as they do in other fields of law." (*Leone v. Commissioner, Indiana Bureau of Motor Vehicles* (Ind. 2010) 933 N.E.2d 1244, 1254, citations omitted.)

### B. *Proprietary Interest in Domain Names*

As defined by federal statute, a "domain name" is "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." (15 U.S.C. § 1127.) A domain name is more commonly known as a Web site address. "A registrar is a company that accepts and processes applications for domain name[s]." (*Solid Host, NL v. NameCheap, Inc.* (C.D.Cal. 2009) 652 F.Supp.2d 1092, 1103.)

"Each entity connected to the Internet has a unique address known as an Internet Protocol, consisting of a string of numbers connected by dots that is readable by computers. For ease of human use, the domain name system was developed whereby alpha-numeric character strings correspond to Internet Protocol addresses. Each domain name consists of a combination of a Top Level Domain ('TLD') and Second Level Domain ('SLD') name, which are separated by a period known as a 'dot.' . . . There are approximately 240 TLDs, but there are four that have primarily been used by the public in the United States. These are: '.com,' often reflecting a commercial entity; '.org,' which generally suggests a not-for-profit organization; '.net,' indicating an entity involved in the Internet network; and '.edu.' which normally corresponds to an educational institution. An SLD name is a string of numbers

and/or letters immediately to the left of the dot in the address that is created and chosen by the registrant, *i.e.*, the individual or organization operating the Internet address. For instance, in the domain name 'example.com,' '.com' is the TLD and 'example' is the SLD name." (*Smith v. Network Solutions, Inc.* (N.D.Ala. 2001) 135 F.Supp.2d 1159, 1160–1161, fn. omitted.)

"When an individual or an organization desires to register a domain name, it may do so through any accredited registrar. Generally, this is done through the submission of an electronic registration application submitted at a registrar's online address. The applicant first chooses one of the TLDs offered by the registrar and then creates an accompanying SLD name, thereby fashioning a potential domain name, which is then submitted electronically to the registrar for approval. However, no two SLD names within a given TLD can be identical. Accordingly, if someone submits an application for a particular domain name that already exists . . . , that name cannot be registered again, and the applicant is advised that the sought domain name is unavailable. The applicant may then choose to submit an application for an alternate domain name, either by changing or adding or subtracting a letter(s) or number(s) or a dash(es) to his initially submitted SLD name within the same TLD, or by going to another TLD where the initially submitted SLD name is still available. If there is no existing registration for a given SLD name within a given TLD, that domain name is considered available and generally may be registered on a first-come, first served basis." (*Smith v. Network Solutions, Inc., supra*, 135 F.Supp.2d at pp. 1161–1162, fn. omitted.)

"Property is an abstract concept 'commonly used to denote everything which is the subject of ownership.' The law characterizes property as a bundle of rights, which includes the rights of use, exclusion, and alienation. Domain name registrants seemingly appear to possess all three component rights. Upon closer analysis of the formation of domain names, however, it becomes apparent that a domain name is not property, but rather the product of a contract for services between the registrant and the registrar.

"A domain name does not exist until it is registered. To secure the creation, registration, and use of a domain name, one must first assent to the registrar's contract. In addition to the payment of a small fee, the contract requires a potential registrant to agree to (1) provide and maintain current and accurate identifying information; (2) indemnify the registrar; and (3) abide by an alternative dispute resolution policy. In exchange, the registrar obligates itself to establish and maintain . . . the domain name . . . so it can operate as a functional Internet address. The registrar is obligated to provide services *only so long as the registrant continues to pay a periodic renewal fee and is otherwise not in breach. Once the contract terminates, the registration expires and the domain name effectively becomes nonexistent—returning to*

*the public domain for anyone to register.* Accordingly, '[t]he nature of a domain name, technically and simply, is a reference point in a computer database . . . . It is created by the registration process before which it does not exist, and it has no utility or function separate and apart from the [contractual] Internet services provided by registrars . . . .' " (Note, Kremen v. Cohen: *The "Knotty" Saga of Sex.Com* (2004) 45 Jurimetrics J. 75, 84–85, fns. omitted, italics added; see *id.* at pp. 84–91 [consensus among courts nationwide is that domain name is a product of contract for services, not property owned by registrant, with notable exception of Ninth Circuit decision in *Kremen v. Cohen* (9th Cir. 2003) 337 F.3d 1024]; *Network Solutions, Inc. v. Umbro Internat.* (2000) 259 Va. 759 [529 S.E.2d 80, 85–86] [domain name is a product of contract for services]; but see Note, *You Can Have It, But Can You Hold It?: Treating Domain Names as Tangible Property* (2010–2011) 99 Ky. L.J. 185, 191–209 [most reasonable approach is to treat domain name as tangible property rather than as a product of services contract or intangible property]; Note, *Regulating the Domain Name System: Is the ".Biz" Domain Name Distribution Scheme an Illegal Lottery?* (2003) 2003 U.Ill.L.Rev. 245, 269–273 [domain name constitutes property].)

Regardless of whether a domain name is a registrant's property or merely the product of a services contract, a registrant may lose any proprietary interest in the domain name if he or she fails to pay periodic renewal fees or breaches the registration agreement with the registrar. We turn first to the failure to pay renewal fees. "The Internet Corporation for Assigned Names and Numbers (ICANN), created in 1998 to manage and coordinate domain name systems, does not have a proper uniform policy regarding domain name expiration. With most domain name registrars, if a domain name owner does not re-register his domain name within seventy-five days, it is open to the public, or in some instances, the highest bidder. The domain holder's intent to re-register the domain name is totally disregarded." (Silbert, *Trademark Law, ICANN, and Domain Name Expiration* (2008) 36 AIPLA Q.J. 311, 314–315, fns. omitted.)

For example, Tucows, Inc., the registrar for NJweedman.com, indicates that "Edward Forchion" is the registrant of that domain name.[51] Tucows lists Forchion's residence as "Browns Hills, New Jersey," and provides the same street address that appears on his recent nomination petition for the New Jersey Assembly. According to Tucows, the registration of "NJweedman.com" expires on March 1, 2012. Tucows's renewal and expiration policy is as follows: "During the [40-day] Grace Period [after the expiration date], all services (such as the website and email) cease working until the name is renewed (if and when this happens). . . . [¶] At the end of the Grace Period

---

[51] To obtain information on NJweedman.com or any domain name, type the name into "WhoIs Lookup" at Tucows's Web site (<http://www.tucowsdomains.com>).

one of three things may happen: [¶] [(1)] The domain is marked for deletion, and with most types of domain names this will place the domain name [into] a 'Redemption Period' . . . , which is an additional period of time[, usually 40 days,] to recover the domain name. The cost to recover the domain will be more than the cost of a renewal . . . . [¶] [(2)] [Another] party expresses interest in the expired domain name via an online auctioning system, and when the Grace Period ends, the domain is sold to the highest bidder. Domains that are auctioned off cannot be renewed or 'redeemed.' [¶] [(3)] Tucows acquires the domain name for its private domain portfolio, and upon the Grace Period ending, the domain is not deleted. Should the former domain name owner inquire about obtaining the domain name via their Domain Provider, the domain can be returned to them in a process similar to 'redeeming' a domain. Additional recovery and administrative fees may apply."[52]

Thus, if Forchion had prevailed in the trial court, his name would permanently become NJweedman.com without any further action on his part. But if, thereafter, NJweedman.com failed to renew NJweedman.com when it expired on March 1, 2012, or some later expiration date, another party could acquire NJweedman.com. If both parties then used NJweedman.com to conduct business, confusion might occur. NJweedman.com could use his personal name in a range of commercial ventures. At the same time, NJweedman.com would be under the control of someone else, who could change the content of the Web site. The dual use might create confusion, depending in part on what the new registrant did with NJweedman.com.

As stated, Forchion could also lose the use of NJweedman.com as a domain name if he breached the registration agreement with Tucows, thereby allowing someone else to register the name. (See Note, Kremen v. Cohen: *The "Knotty" Saga of Sex.Com, supra,* 45 Jurimetrics J. at p. 85.) A standard agreement contains numerous terms.[53] For example, all registration agreements are required to contain a provision that prohibits the registrant—here, Forchion—from using a Web site in violation of any applicable laws or regulations.[54] If Forchion breached the agreement with Tucows, and Tucows terminated his registration, the domain name might be made available to

---

[52] Tucows Domains, What happens to domain names when they expire? <http://www.tucowsdomains.com/topic/renewal-and-expiration>.

[53] See, e.g., WebFaction, Tucows Registration agreement <http://www.webfaction.com/legal/opensrs>; Webzpro, Domain Registrant Agreement <http://www.webzpro.com/domain-registrant-agreement>.

[54] See Internet Corporation for Assigned Names and Numbers (ICANN), Uniform Domain Name Dispute Resolution Policy (eff. Oct. 24, 1999), paragraph 2(d) <http://www.icann.org/en/udrp/udrp-policy-24oct99.htm>; see, e.g., WebFaction, Tucows Registration agreement, section 2 <http://www.webfaction.com/legal/opensrs>; eNom, Registration Agreement, section 4.b.ii <http://www.enom.com/terms/agreement.aspx>.

others and ultimately registered by someone else.[55] Thus, if Forchion obtained "NJweedman.com" as a personal name but lost it as a domain name due to breach of the registration agreement, confusion could ensue, just as it might if Forchion failed to pay renewal fees.

But even if Forchion renewed NJweedman.com as a domain name for the rest of his life and never breached the registration agreement, his attempt to use NJweedman.com as a personal name and a domain name might create confusion. For instance, when used as a domain name, NJweedman.com might be so similar to a trademark that the Web site would have to be discontinued and the domain name canceled. (See, e.g., *Brookfield Communications v. West Coast* (9th Cir. 1999) 174 F.3d 1036, 1057–1060 [trademark owner of "MovieBuff" entitled to injunction against video rental store chain's use of domain name "moviebuff.com"]; *Ohio State University v. Thomas* (S.D. Ohio 2010) 738 F.Supp.2d 743, 748–757 [domain name "www.buckeyeillustrated.com" infringed Ohio State University's trademark "Buckeye," entitling university to temporary restraining order prohibiting use of domain name]; *Transamerica Corp. v. Moniker Online Services, LLC* (S.D.Fla. 2009) 672 F.Supp.2d 1353, 1356–1358 [declining to dismiss Transamerica's claims that defendants' domain names infringed the trade name "Transamerica" and that they improperly directed Transamerica customers to defendants' insurance Web sites]; *Vulcan Golf, LLC v. Google Inc.* (N.D.Ill. 2008) 552 F.Supp.2d 752, 759–760, 763–770 [declining to dismiss claim that defendants' registered domain names were so similar to plaintiff's that they improperly attracted plaintiff's customers]; *Bayer Corp. v. Custom School Frames, LLC* (E.D.La. 2003) 259 F.Supp.2d 503, 509–510 [enjoining defendant's use of "no-fleas.com" domain name because of its similarity to plaintiff's use of "nofleas.com"]; see generally Shaver, *Conflicts Between Domain Names and Trademarks* (2007) 50 Advocate (Idaho) 20, 20–22.)

If NJweedman.com were canceled as a *domain* name, NJweedman.com, the individual, would still be called NJweedman.com and could use that name in conducting business notwithstanding his loss of the domain name. We are not aware of any judicial procedure that would allow another party to change NJweedman.com's *personal* name. In those circumstances, NJweedman.com, used solely as a personal name without a Web site counterpart, might cause confusion with a similar domain name or a trademark.

We acknowledge the uncertainty of knowing whether Forchion would fail to renew NJweedman.com as a domain name or whether Tucows would find he breached the registration agreement. The same unpredictability exists with

[55] See ICANN, Registrar Accreditation Agreement, section 3.7.5.3 <http://www.icann.org/en/registrars/ra-agreement-21may09-en.htm#3>; WebFaction, Tucows Registration agreement, section 16 <http://www.webfaction.com/legal/opensrs>.

respect to whether NJweedman.com, when used as a personal name and a domain name or solely as a personal name, would cause confusion because of the existence of a similar domain name or a trademark. In that regard, there is a "Weed Man" Web site run by a New Jersey company that offers lawn care services in New Jersey.[56] According to that site, "Weed Man is a network of locally owned and operated lawn care professionals . . . [that has been in existence] [f]or the past 40 years."[57] In addition, several residents of New Jersey have the last name "Weedman," any one of whom might have, or might be interested in having, a domain name containing his or her *actual* name.

In ruling on a name change petition, the trial court should not have to determine the likelihood that there is a domain name or a trademark so similar to the requested name that confusion may result. We should not create a situation where an *individual's* new name may—now or eventually—be so similar to a domain name or a trademark as to cause confusion. It follows that individuals and domains, respectively, should not share the same names.

In sum, personal names and domain names should not overlap; they belong in distinct realms. Domain names were created for use on the Internet and should be limited to assisting a user in finding a desired Web site. By the same token, we should not treat a person as part of a domain.

## C. *Nexus Between Personal Name and Domain Name*

If the trial court had granted Forchion's petition, the use of a domain name as his personal name would, in effect, give his personal name a second-ary meaning. By that, we mean NJweedman.com, as a personal name, could not be fully understood without viewing the Web site of the same name. And NJweedman.com, the individual, would control the content of NJweedman.com, the site, which he could change without anyone's approval.

But the domain name, NJweedman.com, should not also serve as Forchion's personal name as long as he uses the Web site to encourage others to violate the law.

As of today, NJweedman.com still urges individuals to call New Jersey law enforcement at a specific telephone number and provide false police reports about the use of marijuana, hoping to send the police on wild goose chases and squander valuable resources. This alleged crime (see N.J. Stat. Ann. § 2C:28-4b(2)) was discussed by the New Jersey Superior Court in denying

---

[56] <http://central-jersey.weedmanusa.com>.
[57] *Ibid.*

Forchion's name change application almost a decade ago. And the law enforcement telephone number shown on the Web site is still in service.

The New Jersey court's opinion also referenced the site's instructions on how to grow marijuana. The site currently features a video of Forchion explaining how to set up an automated system to grow marijuana at home, including his offer to assist in setting it up for a "split of the proceeds." Although California's Medical Marijuana Program Act (Health & Saf. Code, §§ 11362.7–11362.83) typically permits a qualified patient to grow up to six mature plants or 12 immature plants (see *id.*, § 11362.77, subd. (a)), Forchion's video should not be misinterpreted as an effort to help patients comply with the act. His video ends with the words, "GROW YOUR OWN," "FUCK THE LAW!!!" Simply put, the video is not restricted to the *legal* use and cultivation of medical marijuana in California.

Forchion is also attempting to tamper with prospective jurors. Among the more recent additions to the site is a video entitled "Message to My Jurors" in which Forchion portrays himself as the victim of his April 1, 2010 arrest for possessing a pound of marijuana while driving in New Jersey. The video ends with, "Use Jury Nullification—Just Say Not Guilty." In a separate "personal message" to his potential jurors, which appears in print, Forchion advises them not to tell anyone they are going to acquit him "no matter what the prosecution presents." He tells them to use jury nullification to end the war on potheads and then provides links to other Web pages supporting the use of jury nullification.

Last, Forchion provides information to employees who are prohibited from being under the influence of illegal drugs at the workplace or from using them at all, such as operators of heavy equipment, government employees who work with classified documents, and law enforcement officers. They can still use illegal drugs, he advises, and pass a drug test by purchasing products offered at either of two other Web sites, both of which have a link at his site. Again, this should not be mistaken for an effort to assist qualified patients under the California Compassionate Use Act of 1996. The act does not, and was not intended to, prohibit employers from discharging employees who fail a drug test for marijuana. (See *Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 924, 930 [70 Cal.Rptr.3d 382, 174 P.3d 200].) Forchion provides links to the other Web sites so that individuals who are prohibited by the terms of their employment from using illegal drugs may use them anyway and escape detection notwithstanding a drug test. As a consequence, other employees are exposed to a hazardous work environment.

## D. *Comity*

■ "The philosophy behind the comity doctrine is easily identified: respect for the sovereignty of other states or countries, ' "considerations of mutual utility and advantage." ' " (*Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 134 [216 Cal.Rptr. 412, 702 P.2d 570].) Similarly, "[u]nder the United States Constitution, each state must give full faith and credit to the judicial proceedings of every other state. (U.S. Const., art. IV, § 1.) In California, the constitutional requirement is reflected in Code of Civil Procedure section 1913, which provides that the effect of a judicial record of a sister state is the same in this state as in the state where it was made. [¶] Under the full faith and credit clause, full res judicata effect attaches to a sister state judgment when the party sought to be bound by the judgment participated in the litigation and had a full opportunity to contest the sister state court's jurisdiction. . . . [¶] This means that the sister state judgment bars relitigation in California of any issue which was, or could have been litigated in the sister state action." (*Tyus v. Tyus* (1984) 160 Cal.App.3d 789, 792 [206 Cal.Rptr. 817], citations omitted.)

We do not go so far as to say that res judicata applies to the New Jersey decision denying Forchion's prior attempt to change his name to NJWeedman.com. Courts are divided over whether res judicata applies to name changes. (Compare *Braunschweig v. Fahrenkrog* (Iowa 2009) 773 N.W.2d 888, 893–894 [res judicata applicable] with *In re Mokiligon* (Ct.App. 2004) 137 N.M. 22, 25 [106 P.3d 584, 587] [res judicata inapplicable].) But the principles that underlie the application of that doctrine are present here.

As a matter of comity, it is not the role of a California court to permit an individual to change his name if the courts of his *current* home state have previously denied his application for the *same* name change, and the first two letters of the requested name—NJ—are not only the home state's abbreviation but are intended to refer to that state. As Forchion put it, " 'I am NJWeedman, not the California Weedman or the Los Angeles Weedman—the New Jersey Weedman.' " The issues raised by the present name change petition were or could have been litigated in the New Jersey proceedings, which were adversarial. The law division's denial of the name change was affirmed on appeal. Material circumstances have not changed in a way that would warrant a reexamination of the prior New Jersey decision. Indeed, Forchion is facing trial in New Jersey on marijuana charges that arose after the New Jersey courts denied his 2001 name change application.

■ Forchion has stated in an affidavit that New Jersey is his state of residence; he is a candidate for a state assembly seat there; the registration for the domain name NJweedman.com lists a New Jersey address for him; and he

refers to California as his state of "asylum." In that regard, the California name change statute fixes venue in "the superior court of the county where the [petitioner] resides" (Code Civ. Proc., § 1276, subd. (a)), suggesting that California residency is a prerequisite to filing a petition.

In closing, we note that the trial court commented it might approve a name change if Forchion did not end his requested name with ".com" but instead spelled it out—"NJweedman Dot Com." To us, this exalts form over substance. (See Civ. Code, § 3528.) Many of the same problems we have already identified would still exist.

## III

## DISPOSITION

The order is affirmed.

Rothschild, J., and Chaney, J., concurred.